IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KIM MICHELLE CABRERA, | CASE NO. 1:20-CV-01947-JG |
| Plaintiff, | JUDGE JAMES GWIN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Kim M. Cabrera filed a Complaint against the Commissioner of Social Security ("Commissioner") challenging the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 1, 2020, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision denying DIB.

PROCEDURAL BACKGROUND

Ms. Cabrera filed for DIB on August 17, 2018, alleging a disability onset date of April 2, 2016. (Tr. 164-65). Her claims were denied initially and on reconsideration. (Tr. 71-98). She then requested a hearing before an administrative law judge. (Tr. 113). Ms. Cabrera (represented by

counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 4, 2019. (Tr. 40-69).

On September 26, 2019, the ALJ issued a written decision finding Ms. Cabrera not disabled. (Tr. 12-36). The Appeals Council denied Ms. Cabrera's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Cabrera timely filed this action on August 31, 2020. (ECF #1).

FACTUAL BACKGROUND

I.    ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Cabrera and VE Brett Salkin at the hearing before the ALJ.

Ms. Cabrera lives with her son, daughter, and granddaughter (who was eleven weeks old at the time of the hearing). (Tr. 44). Ms. Cabrera completed high school and, after a year of higher education in England, received a certificate. (Tr. 45). Ms. Cabrera also has certificates in real estate and insurance. (*Id.*). Ms. Cabrera has a driver's license and still drives but does so less often. (*Id.*).

Ms. Cabrera last worked on April 2, 2016. (Tr. 52). She testified she can no longer work because of "chronic pain 24/7" and difficulty walking even short distances. (*Id.*). Ms. Cabrera has been to physical therapy a couple of times a year. (Tr. 53). She explained she goes to physical therapy for poor balance and restricted movement. (*Id.*). Ms. Cabrera uses a cane, prescribed by her primary care physician, or a walker for balance. (Tr. 61). The walker gives her more stability and keeps pressure equal on both sides of her body. (*Id.*). Ms. Cabrera treats with a neurologist and receives Botox injections in her head, neck, and shoulders. (Tr. 53). Ms. Cabrera also treats with a pulmonologist for recurrent lung infections, and has Type II diabetes. (Tr. 54). Ms. Cabrera does

2

not sleep well because of obstructive sleep apnea (OSA) and pain. (Tr. 60). She usually wakes up every hour and a half to two hours and feels constantly exhausted. (*Id.*). When exhausted, she gets weepier and feels "out of control." (*Id.*).

Ms. Cabrera has depression, anxiety, and PTSD. (Tr. 58). She sees a counselor and a psychiatrist, who manages her mental health medications. (*Id.*). Ms. Cabrera's depression gets so bad that it is "almost crippling sometimes." (*Id.*). She experiences times where she cannot cope with the pain. (*Id.*). Ms. Cabrera testified she is always on the verge of tears, zones out at times, and needs reminders from her daughter to take her medications. (Tr. 59). Ms. Cabrera has panic attacks "quite often," which are triggered by stress, leaving the house, and other situations. (*Id.*). She also gets mood swings and snaps at others. (*Id.*).

Ms. Cabrera testified that she would not be able to maintain a 40-hour work week because she "wouldn't be able to concentrate and retain information and function." (Tr. 60). She finds it difficult to have conversations, finds herself tongue-tied or slurring her words, claims it is hard to think, and cannot do things she used to do, like learn computers or programs. (*Id.*).

Ms. Cabrera's daughter is her primary care giver – she drives Ms. Cabrera to medical appointments, handles the household chores, takes her shopping, and does all the lifting in addition to working full-time. (Tr. 54-55). Ms. Cabrera changes her granddaughter's diaper and occasionally gives her a bottle but noted she cannot lift anything, so the baby, approximately ten pounds, is handed to her. (Tr. 55-56). When Ms. Cabrera's daughter is at work, Ms. Cabrera and her son care for the baby. (Tr. 56).

Ms. Cabrera cooks about two or three times a week. (Tr. 54). She noted that the process "takes forever" because she must sit down after ten minutes. (*Id.*). Ms. Cabrera goes to the

laundromat with her daughter. (Tr. 56). Her daughter moves the clothes to and from the washer and dryer, whereas Ms. Cabrera can only sit and fold the clean clothes. (*Id.*). Ms. Cabrera's children take care of the other household chores. (*Id.*).

Ms. Cabrera testified she does not do much throughout a typical day. (Tr. 57). Her activities include cooking two or three times a week, folding laundry, watching television, and talking to her mother daily on the phone. (*Id.*). Ms. Cabrera does not have any social life. (*Id.*). Ms. Cabrera showers only once or twice a week because she rarely goes upstairs. (*Id.*).

The VE then testified. He characterized Ms. Cabrera's past work as follows:

- Travel Agent, Dictionary of Occupational Titles ("DOT") 252.152-010, specific vocational preparation ("SVP") 5 (skilled), sedentary as actually and generally performed; and

- Administrative Clerk, DOT 219.362-010, SVP 4 (semi-skilled), light as generally performed, sedentary as actually performed.

(Tr. 63).

The ALJ proposed the following hypothetical individual and asked if such an individual could perform Ms. Cabrera's past relevant work: an individual of Ms. Cabrera's age, education, and vocational profile, who can lift, carry, push, and pull twenty pounds occasionally, ten pounds frequently; stand and/or walk for four hours in an eight-hour workday; sit for six hours of an eight-hour workday; occasionally climb ramps and stairs; never climb ropes, ladders, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; can be frequently exposed to fumes, dusts, gases, and poor ventilation; can never be exposed to hazards of unprotected heights; cannot work at a production rate pace; and can have frequent interactions with supervisors and co-workers. (Tr. 65). The VE responded that such an individual could perform all identified past work. (*Id.*). The VE provided other jobs the hypothetical individual could perform, including Mail

4

Clerk (DOT 209.687-026, light exertion, SVP 2 (unskilled)), Information Clerk (DOT 237.367-018, light exertion, SVP 2 (unskilled)), and Office Helper (DOT 239.567-010, light exertion, SVP 2 (unskilled)). (Tr. 66).

Ms. Cabrera's counsel cross-examined the VE. The VE testified that if the original hypothetical individual also needed to use a cane or walker for standing and ambulation and could have only occasional or infrequent interaction with the public and co-workers, that individual would not be able to perform Ms. Cabrera's past work or any of the other identified positions. (Tr. 67). The VE explained, "In my opinion, the required use of the cane reduces the person's functional capacity to sedentary. As such, sedentary with occasional and infrequent public contact and no production quotas, I cannot find jobs for this hypothetical person." (*Id.*). In his closing remarks, Ms. Cabrera's counsel noted that his hypothetical, and not the ALJ's, conformed to the limitations opined by the state agency consultants. (Tr. 68).

## II. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Cabrera was 45 years old at the time of her alleged onset date, and 49 years old at the time of the administrative hearing. (Tr. 71). Ms. Cabrera completed one year of technical schooling after graduation from high school. (Tr. 44). In the past, Ms. Cabrera has been employed as a members' consultant at two travel agencies and an office manager. (Tr. 46, 48).

## III. RELEVANT MEDICAL EVIDENCE

On January 25, 2016, Ms. Cabrera attended an initial mental health evaluation under Lauren McGowan, LPCC. Ms. Cabrera reported feeling depressed for four years and endorsed depressive and anxiety symptoms, including depressed mood, difficulty concentrating, fatigue, feelings of worthlessness and guilt, hopelessness, impaired memory, insomnia, irritability, muscle

tension, obsessive thoughts, restlessness, social anxiety, uncontrolled worry, panic attacks, intrusive memories, flashbacks, avoidance, numbness, shaking, shortness of breath, and tearfulness. (Tr. 382). She also reported a minimal degree of difficulty with shopping, cleaning, finances, travel, and cooking. (Tr. 383). Ms. Cabrera attended behavioral help therapy sessions with Ms. McGowan. (Tr. 261-383, 650-696). Most of the time, Ms. Cabrera was calm, forthcoming, cooperative, and able to verbalize thoughts and feelings; she presented with a normal thought process and content, normal speech, logical judgment, and good insight. (Tr. 261, 262, 268, 281, 287, 292, 298, 300, 310, 313, 322, 329, 357, 359, 362, 363, 368, 373, 377, 380, 381, 650, 655, 660, 669, 674, 678, 689, 696). She was occasionally tearful. (Tr. 281, 287, 292, 298, 310, 313, 373).

Ms. Cabrera saw two primary care physicians in the same practice; Sasha Yurgionas, M.D., and Melanie Golembiewski, M.D., oversaw Ms. Cabrera's treatment. In February 2016, Ms. Cabrera saw Dr. Yurgionas on February 2, 2016, with complaints of increased pain and pulmonary issues. (Tr. 378). She endorsed leg swelling, nausea, joint pain, and headaches. Her physical examination was normal. (*Id.*). Dr. Yurgionas diagnosed Ms. Cabrera with chronic fatigue fibromyalgia syndrome. (*Id*). In 2000, Ms. Cabrera had been diagnosed with fibromyalgia and chronic fatigue syndrome. (Tr. 353).

Ms. Cabrera returned to Dr. Yurgionas's office in March 2016. (Tr. 374). She endorsed improved breathing, but also abdominal pain, joint pain, and neck pain. (Tr. 375). Physical examination was normal. (*Id.*). Dr. Yurgionas referred her to pool therapy. (*Id.*).

Ms. Cabrera saw Dr. Golembiewski in April 2016, who referred her to a rheumatology/fibromyalgia clinic. (Tr. 370). Ms. Cabrera returned to Dr. Yurgionas on April 26,

2016 with tearful complaints of chronic whole-body pain and intense leg pain. (Tr. 364). Ms. Cabrera claimed taking Neurontin left her feeling drowsy and caused her to slur her speech, and that Lyrica was not effective. (*Id.*). Ms. Cabrera saw the physical therapist for pool therapy but was unable to participate due to pain. (*Id.*). On physical examination, Ms. Cabrera displayed tenderness to palpation, diffusely in her legs, lumbar spine, shoulders, and neck, but without edema. (Tr. 365). Dr. Yurgionas noted Ms. Cabrera had failed to follow up with intensive pain management through the Cleveland Clinic. (*Id.*). Dr. Yurgionas counseled Ms. Cabrera on the need for chronic pain management and instructed her to discontinue any medications that were not assisting her. (*Id.*).

Ms. Cabrera saw Dr. Yurgionas on June 6, 2016 for a follow-up appointment. Ms. Cabrera endorsed continued musculoskeletal pains, chronic fatigue, and depression. (Tr. 359). Her physical examination was normal. (Tr. 360). The doctor referred Ms. Cabrera to physical therapy again. (*Id.*).

At her July appointment with Dr. Yurgionas, Ms. Cabrera endorsed intense whole-body tenderness and pain. She stated it had been worsening since February and she was now unable "to work or to even walk appropriately." (Tr. 352). Physical examination revealed diffuse tenderness in Ms. Cabrera's legs, lumbar spine, shoulders, and neck, but without edema. (Tr. 353). Ms. Cabrera agreed to follow up with the intensive pain management program. (Tr. 354). In October 2016, at Ms. Cabrera's request, Dr. Yurgionas referred her to a neurologist. (Tr. 343).

In February 2017, Ms. Cabrera had a complete physical exam with Dr. Golembiewski. (Tr. 336). Ms. Cabrera noted she would be starting with chronic pain management at the end of the

month. (*Id.*). Ms. Cabrera walked with a cane, but exhibited normal musculoskeletal range of motion, normal muscle tone, and normal coordination. (Tr. 337).

In April 2017, Dr. Golembiewski determined Ms. Cabrera's diabetes mellitus was under good control and started her on Metformin. (Tr. 335). On physical examination, the doctor noted Ms. Cabrera used a walker, but she exhibited normal range of motion, normal muscle tone, and normal coordination. (Tr. 334). Her diabetic foot exam was normal. (*Id.*).

In early June, Ms. Cabrera told Yatsana Santana, LPN, that she had completed an intense three-week chronic pain management program. (Tr. 332). She reported receiving a lot of therapy and found her pain was more related to PTSD and depression. (*Id.*). She received prescriptions for maprotiline, hydroxyzine, and prazosin. (*Id.*). She reported feeling better, came to her appointment with a cane instead of a walker, and even wore makeup and a new hairstyle. (*Id.*).

On June 23, 2016, Ms. Cabrera saw Dr. Golembiewski for continued chest congestion and numbness in her left leg. (Tr. 327). She explained her leg pain started before May. (*Id.*). She endorsed some foot swelling with activity, and numbness. (*Id.*). Ms. Cabrera received Augmentin for the chest pain and an order for a chest CT scan. (Tr. 328). Dr. Golembiewski felt Ms. Cabrera's leg pain related to her iliotibial band and suggested stretching and using a transcutaneous electrical nerve stimulation (TENS) unit on her back. (*Id.*). The doctor noted she would consider low back imaging if leg symptoms persist. (*Id.*).

On September 11, 2017, Ms. Cabrera met with Christine Williams, APRN, CNP, for a diabetic visit. (Tr. 322). Ms. Cabrera expressed concerns about her blood pressure and pulse tachycardia. (*Id.*). She denied chest, arm, and jaw pain, and did not have shortness of breath with the palpitations. (*Id.*). Physical and diabetic foot examinations were normal. (Tr. 325).

In October 2017, Ms. Cabrera underwent an initial psychiatric assessment with Lecresha Rox, APRN, CNP. On mental status examination, Ms. Cabrera displayed a depressed mood, was pleasant and cooperative but tearful, was fully oriented, and spoke at a normal rate. (Tr. 320). Her recent, remote, and immediate memory were intact, and she was able to maintain attention throughout the interview. After the assessment, Ms. Rox diagnosed Ms. Cabrera with PTSD and prescribed Lamictal. (*Id.*).

Ms. Cabrera saw Ms. Williams again on October 16, 2017 for a diabetic visit. (Tr. 315). Ms. Cabrera was upset at this visit, endorsing severe pain. (*Id.*). She claimed therapy was not helpful and made her feel worse, reported that NSAIDs are too hard on her stomach, and felt that nothing helps with her pain. (*Id.*). The nurse noted a normal physical examination, except that Ms. Cabrera was requesting pain medication and crying because her previous functional capacity assessment may not be helpful in getting social security or VA benefits. (Tr. 317). The nurse also noted Ms. Cabrera's diabetes mellitus was under good control. (*Id.*). She provided Ms. Cabrera with a referral for pain management. (Tr. 318).

Dr. Golembiewski prescribed tramadol for pain after Ms. Cabrera explained that she has done all the referrals, taken the medications, and abided by the treatment plans but nothing has helped her pain and activities of daily living. (Tr. 296). On examination, Ms. Cabrera had an antalgic gait and used a cane to walk. (Tr. 296-97). Ms. Cabrera returned to Dr. Golembiewski's office on March 19, 2018 and reported the tramadol helped her function. (Tr. 284). She denied confusion. (Tr. 285). During an appointment with Ms. Rox the next day, Ms. Cabrera reported feeling fuzzy most days, crying over little things, and feeling fatigued. (*Id.*). Ms. Rox discontinued

Ms. Cabrera's prescription for Lamictal but continued her prescriptions for hydroxyzine, maprotiline, prazosin, and Xanax. (Tr. 284).

At her appointment in May 2018, Ms. Cabrera exhibited 18/18 positive fibromyalgia tender points on examination and was tearful when discussing the pain. (Tr. 275). Dr. Golembiewski noted that tramadol is not ideal but has been the only pain medication that provides Ms. Cabrera enough relief to rest and sleep. (*Id.*). In November 2018, Ms. Cabrera complained of increased tremor that waxed and waned and reported memory loss. (Tr. 738). She did not have a tremor on examination but used a walker and was noted to have trace leg non-pitting edema. (Tr. 742). On December 11, 2018, Ms. Cabrera noted a tremor in her hands and head. (Tr. 736). She used a walker but did not have lower extremity edema. (Tr. 737).

In February 2019, Ms. Cabrera was a passenger in a motor vehicle accident. (Tr. 724-25). She saw Dr. Golembiewski who noted Ms. Cabrera was tender through her shoulder girdle and back musculature. (Tr. 726). In May 2019, Ms. Cabrera followed up with Dr. Golembiewski for a diabetic visit. (Tr. 717). She had some neuropathy in her feet, was ambulating with a cane, and displayed the same tenderness through her shoulder girdle and back musculature. (Tr. 719). Dr. Golembiewski increased her diabetic medications. (Tr. 716).

State agency medical consultants reviewed Ms. Cabrera's medical records at the initial and reconsideration levels. At the initial level, the medical consultant determined Ms. Cabrera can lift and carry twenty pounds occasionally, ten pounds frequently; stand and walk for a total of four hours; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; and must

avoid all exposure to hazards such as machinery and heights. (Tr. 93-94). The medical consultant at the reconsideration level adopted the opinion. (Tr. 79).

State agency psychiatric consultants reviewed Ms. Cabrera's mental health records and concluded Ms. Cabrera was moderately limited in her abilities to carry out detailed instructions, maintain concentration and attention for extended periods of time, maintain a regular schedule, work in coordination with or in proximity to others without being distracted by them, complete a normal workday without interruptions from psychologically based symptoms, perform at a consistent pace, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them. (Tr. 95). The psychiatric consultant at the reconsideration level adopted the opinion. (Tr. 81).

Ms. Cabrera's counselor, Lauren McGowan, and Dr. Yurgionas completed a mental health questionnaire form with opinions about Ms. Cabrera's ability to perform work-related activities on a day-to-day basis. (Tr. 641-42). They opined Ms. Cabrera had no limitations in her abilities to carry out very short and simple instructions, carry out detailed instructions, work in coordination with or in proximity to others without being distracted by them, remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, interact appropriately with the general public, ask simple questions or request assistance, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*). They believed Ms. Cabrera was limited but satisfactory in her abilities to maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance and be punctual within customary

11

tolerances, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without disturbing them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independent of others. (*Id.*).

They further opined Ms. Cabrera was seriously limited but not precluded from sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 641). Finally, they noted that, per Ms. Cabrera's reports, Ms. Cabrera would be absent from work two days a week and her impairments would lead her to be off task throughout the day. (Tr. 642).

## THE ALJ'S DECISION

The ALJ's decision, dated September 26, 2019, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2. The claimant has not engaged in substantial gainful activity since April 2, 2016, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia, obesity, depressive, bipolar, and related disorders, anxiety and obsessive compulsive disorders, and trauma and stressor-related disorders (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can lift, carry, push, and pull 20 pounds occasionally

and 10 pounds frequently, she can stand and walk four hours in an eight-hour workday, she can sit six hours in an eight-hour workday, she can occasionally climb ramps and stairs, she can never climb ladders, ropes, and scaffolds, she can frequently balance, she can occasionally stoop, kneel, crouch, and crawl, she can have frequent exposure to fumes, odors, dusts, gases, and poor ventilation, she can never be exposed to hazards (unprotected heights), she cannot work at a production rate pace, and she can have frequent interaction with supervisors and co-workers.

6.    The claimant is capable of performing past relevant work as a Travel Agent and Administrative Clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from April 2, 2016, through the date of this decision (20 CFR 404.1520(f)).

(Tr.17-33).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the

13

evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

14

than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is

disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination
    of impairments, that is "severe," which is defined as one which substantially
    limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform
    past relevant work?

5.  Can claimant do any other work considering her residual functional capacity,
    age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only those claimants who satisfy each element of the analysis, including inability to do other work,

and meet the duration requirements will be determined disabled. 20 C.F.R. § 404.1520(b)-(f); *see*

*also Walters*, 127 F.3d at 529.

### DISCUSSION

Ms. Cabrera offers a variety of reasons as to why the ALJ's decision is not supported by

substantial evidence and alleges numerous errors in the ALJ's evaluation of the medical evidence

and Ms. Cabrera's testimony. I address each argument in turn.

I.      **The ALJ properly evaluated the totality of the evidence.**

     A.      **Evaluation of the severity of impairments at Step Two**

Initially, Ms. Cabrera argues the ALJ did not properly evaluate all the evidence of record. She alleges error related to the ALJ's finding of non-severe impairments (diabetes mellitus, asthma, tachycardia, OSA, and irritable bowel syndrome) at Step Two of the sequential evaluation and argues she presented more than *de minimis* evidence that these impairments provide additional limitations. Ms. Cabrera claims the ALJ's failure to consider all her impairments is harmful, reversible error. (Pl.'s Br., ECF #14, PageID 860-61). In support, she points to records noting diabetic neuropathy, development of a tremor, shortness of breath and chest pain, and mild persistent tachycardia. (*Id.* at PageID 861). In response, the Commissioner notes that aside from making the claim, Ms. Cabrera provides little legal or factual support that the identified impairments were severe. (Comm'r's Br., ECF #15, PageID 884).

Ms. Cabrera's argument regarding the Step Two findings is unpersuasive. At Step Two of the sequential evaluation, the ALJ determines whether an individual's impairments are severe. 20 C.F.R. § 404.1520. In the Sixth Circuit, the severity determination is "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.* When an ALJ considers all the claimant's impairments in the remaining steps of the sequential evaluation, an ALJ's failure to find additional severe impairments at Step Two is not reversible error. *Walton v. Astrue,* 773 F. Supp. 2d 742, 747 (N.D. Ohio Jan. 18, 2011).

The ALJ reviewed and summarized the medical records related to Ms. Cabrera's diabetes mellitus, asthma, tachycardia, OSA, and irritable bowel syndrome. (Tr. 18-19). The ALJ concluded there is no indication in the record that the symptoms from these non-severe impairments (asthma excepted) caused more than a minimal limitation in Ms. Cabrera's ability to engage in basic work-related activities for more than a 12-month period. (*Id.*). As to Ms. Cabrera's asthma, the ALJ concluded the same, but noted she included functional limitations resulting therefrom. (Tr. 18). The ALJ also stated: "Overall, I considered all of [Ms. Cabrera's] medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity." (Tr. 19).

I conclude the ALJ did not err by finding the above-identified conditions non-severe at Step Two because the ALJ considered all of Ms. Cabrera's impairments when assessing her RFC. Indeed, the ALJ provided restrictions limiting Ms. Cabrera's exposure to fumes, odors, dusts, gases, and poor ventilation to account for her non-severe asthma. (Tr. 28).

## B.     Evaluation of fibromyalgia

Ms. Cabrera next argues the ALJ did not consider Social Security Ruling 12-2p, which sets forth the process for evaluating fibromyalgia. She claims the ALJ:

> failed to consider the longitudinal nature of [Ms.] Cabrera's fibromyalgia and that it would cause her to have both good and bad days. The combination of [Ms.] Cabrera's fibromyalgia and other severe impairments limited her ability to engage in substantial gainful activity on a sustained basis. Failure to consider this Ruling was harmful error as [Ms.] Cabrera's fibromyalgia symptoms support her testimony regarding her limitations that if working, she would not be able to concentrate and retain information and function.

(Pl. Br., ECF #14, PageID 863). This is the extent of Ms. Cabrera's argument concerning fibromyalgia.

17

The Commissioner responds that Ms. Cabrera provides little support for her conclusion and has waived this issue because it is less than fully developed. (Comm'r's Br., ECF #15, PageID 885). Alternatively, assuming Ms. Cabrera has sufficiently raised the issue, the Commissioner argues the ALJ addressed all evidence related to Ms. Cabrera's fibromyalgia, provided restrictions in the RFC to address Ms. Cabrera's fibromyalgia-related limitations, and Ms. Cabrera has not shown she was more limited than the ALJ's RFC. (*Id.* at 885-86).

SSR 12-2p offers guidance on how the Commissioner evaluates fibromyalgia in the context of disability claims. SSR 12-2p. Broadly speaking, "the [r]uling requires the ALJ [to] give special consideration to unique features of fibromyalgia[.]" *Riddle v. Comm'r of Soc. Sec.*, No. 17-10905, 2018 WL 822428, at *3 (E.D. Mich. Feb. 12, 2018). SSR 12-2p's guidance is bifurcated. It first applies in determining whether the claimant has a medically determinable impairment of fibromyalgia; then, if necessary, it offers further guidance for determining whether fibromyalgia justifies a disability finding. The ruling is a binding guide for interpreting existing rules, but not a source of new ones. *Boshers v. Comm'r of Soc. Sec.*, No. 1:16-CV-922, 2017 WL 2838236, at *8 (W.D. Mich. July 3, 2017); *see also Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016).

The ALJ determined Ms. Cabrera's fibromyalgia was a severe impairment at Step Two, explained how the severe impairment did not meet or medically equal a listing at Step Three, considered all available medical evidence related to Ms. Cabrera's fibromyalgia, considered Ms. Cabrera's statements about the intensity, persistence, and limiting effects of her pain, and crafted an RFC that provided restrictions in direct accommodation of her condition. (Tr. 17, 19, 21, 22-28). All of this is consistent with the guidance contained in SSR 12-2p.

18

Ms. Cabrera rests her argument on her own statement at the administrative hearing that she "would not be able to concentrate and retain information and function." (Tr. 60). As discussed below, the ALJ evaluated Ms. Cabrera's statements about the intensity, persistence, and limiting effects of her symptoms and appropriately found them to be inconsistent "because the level of limitation alleged is not altogether consistent with objective findings." (Tr. 27). I also note, as did the ALJ, that Ms. Cabrera's own medical providers opined Ms. Cabrera's ability to maintain concentration and attention for extended periods was "limited but satisfactory," and her abilities to understand and remember short, simple instructions and detailed instructions are very good. (Tr. 30, 641-642).

Therefore, the ALJ did not err in applying SSR 12-2p to Ms. Cabrera's fibromyalgia.

### C.    Evaluation of diabetes mellitus under SSR 14-2p

Ms. Cabrera further claims the ALJ failed to discuss SSR 14-2p, which sets forth the process for evaluating diabetes mellitus. Her argument on this issue is somewhat terse, consisting entirely of the following: "In the decision, the ALJ did not consider this Ruling. Rather, contrary to the evidence as detailed above, she found there was no longitudinal record of [Ms.] Cabrera's diabetes. Diabetes which resulted in polyneuropathy [sic]." (*Id.* at PageID 864).

As with SSR 12-2p, SSR 14-2p is a binding guide for interpreting existing rules; it is not a source of new rules. The ALJ does not commit error by failing to reference the SSR, but by failing to conduct the analysis required by the Ruling. *See McClanahan*, 474 F.3d at 834.

The ALJ's written decision includes a thorough recitation of the diabetes mellitus-related medical evidence, including normal examination findings, medication adjustments to control blood glucose levels, and lab test monitoring. (Tr. 18). Based on the record, the ALJ determined

Ms. Cabrera's diabetes mellitus was not a severe impairment because there was no indication in the record that Ms. Cabrera's symptoms caused more than minimal limitation in her ability to engage in basic work-related activities. (*Id.*). Contrary to Ms. Cabrera's assertion, the ALJ did not find there was no longitudinal record of diabetes, but, rather, that Ms. Cabrera's symptoms caused no more than minimal limitation. (*Id.*). Moreover, Ms. Cabrera has not shown that her diabetes mellitus required any limitations not already within the RFC.

For these reasons, Ms. Cabrera has not identified an  error by the ALJ relating to Ms. Cabrera's diabetes mellitus warranting reversal.

### D.    Evaluation of obesity in conjunction with other severe impairments

Ms. Cabrera next claims the ALJ did not properly evaluate the combination of her impairments with obesity. Ms. Cabrera argues "the record is clear that [she] had severe impairments which were impacted by her obesity," and "there was no analysis or discussion of obesity and its relation to [her] musculoskeletal, breathing, diabetic, or psychological impairments." (*Id.*). She takes issue with the ALJ's finding that she can perform light work, stating, without supporting argument, the combination of her obesity and physical problems does not support the finding. (*Id.* at PageID 865).

Here, the ALJ found obesity to be a severe impairment at Step Two. (Tr. 17). At Step Four, the ALJ addressed Ms. Cabrera's obesity again: "I find that due to her obesity the claimant experienced greater functional limitations than might be expected from her other several impairments alone, which is accounted for in the [RFC] articulated above." (Tr. 27). Indeed, the ALJ did, in fact, consider Ms. Cabrera's RFC in conjunction with her other impairments. Moreover, the RFC limits Ms. Cabrera's exertional functions including sitting, standing, walking,

lifting, carrying, pushing, and pulling. (Tr. 21; *see also* SSR 19-2p at *4). The RFC also limits Ms.

Cabrera's non-exertional functions of climbing, balancing, stooping, kneeling, crouching, and

crawling. (*Id.*; *see also* SSR 19-2p at *4).

Ms. Cabrera has not identified an error by the ALJ, nor has she offered medical evidence

or other evidence accepted as consistent with the medical evidence that supports finding greater

restrictions. She offers only a conclusory statement that "the combination of obesity and [Ms.]

Cabrera's other severe impairments would have precluded her from standing/walking even the

four hours a day as stated in the RFC."(Pl.'s Br., ECF #14, PageID 865).

I find no error in the ALJ's evaluation of Ms. Cabrera's obesity in conjunction with other

severe impairments.

### E.    Paragraph B findings at Step Three

Ms. Cabrera disagrees with the ALJ's evaluation of her mental health impairments and

Paragraph B findings at Step Three. She notes the ALJ based her findings on "the fact that [Ms.]

Cabrera was able to verbalize her feelings and thoughts, could attend funerals, was able to

maintain concentration during appointments, watched television, and watched her granddaughter

with her son," but argues that "the statements are contrary to [Ms.] Cabrera's testimony that [Ms.]

Cabrera's daughter was her primary care giver," and "the testimony and medical evidence provided

evidence that [Ms.] Cabrera had marked limitations in interacting with others, maintaining

concentration, and managing oneself." (*Id.* at PageID 866). In support, Ms. Cabrera offers

evidence of her hearing testimony and self-reported statements to her medical providers, and

concludes that this evidence shows the ALJ's findings were not supported by substantial evidence.

Finally, Ms. Cabrera argues the ALJ did not consider that Ms. Cabrera had help at home from the May Dugan Center. (*Id.*).

    While Ms. Cabrera argues the ALJ's statements are contrary to Ms. Cabrera's testimony, the ALJ's Paragraph B conclusions are based on treatment records and statements Ms. Cabrera made to her own medical providers. Her argument is more aptly considered a request to re-weigh the evidence and come to Ms. Cabrera's preferred conclusions, which is outside the scope of this Court's review. *See Brainard*, 889 F.2d at 681. It bears repeating that even if substantial evidence supports a claimant's position, this Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. This is so because of the "zone of choice" within which the Commissioner can act without fear of court interference. *Mullen*, 800 F.2d at 545.

    Moreover, Ms. Cabrera mischaracterizes the May Dugan Center records. Contrary to her assertion that the May Dugan Center provided help at Ms. Cabrera's home, the records reflect that Ms. Cabrera's only identified need was, in her own words, for help "to apply for social security disability." (Tr. 588). Case notes from the May Dugan Center reflect that Ms. Cabrera's appointments were held at the Center's office and directed at helping Ms. Cabrera apply for social security disability. (Tr. 588-96, 628-39). There is no record evidence that anyone from the May Dugan Center went to Ms. Cabrera's home to provide help around the home.

    As a result, I conclude that Ms. Cabrera's argument on this issue fails.

### F.    Evaluation of medical opinions

    Ms. Cabrera claims the ALJ's evaluation of the medical opinions did not accord with the regulations because the ALJ should have considered the length of the treating relationship and the

frequency of the medical provider's examinations along with the nature and extent of the treating relationship. (*Id.* at PageID 867). Ms. Cabrera claims the RFC is not supported by substantial evidence because the evidence supports that she is "limited in her ability to carry out detailed instructions and seriously limited in completing a normal workday, sustaining an ordinary routine without special supervision, and performing at a consistent pace without an unreasonable number and length of rest periods." (*Id.* at PageID 869).

Because Ms. Cabrera filed her application after March 27, 2017, her case is evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these regulations, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 404.1520c(b). The regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at § 404.1520c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—

23

supportability[1] and consistency.[2] *Id.* at § 404.1520c(b). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 404.1520c(b)(2), (3).

The determination of an individual's RFC is an issue reserved for the Commissioner. 20 C.F.R. § 404.1527(d). But even so, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue,* No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). An ALJ may rely on the limitations contained in a medical opinion when forming the RFC, but is not required to adopt all opined limitations, even if she finds the opinion persuasive. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 269 (6th Cir. 2015). The ALJ is required only to say enough to allow this Court to trace the path of the reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.,* 451 F. App'x 517, 519 (6th Cir. 2011).

Here, the ALJ appropriately evaluated the available medical opinions in light of their consistency and supportability. The ALJ was not required to discuss factors other than consistency and supportability because the ALJ did not find any two opinions to be equally persuasive. Indeed, the ALJ determined the state agency psychiatric opinions were "somewhat persuasive," but the mental status examinations did not fully support the opinions. (Tr. 29). On the other hand, the ALJ determined the opinions from Ms. Cabrera's counselor and treating physician were "partly

---

[1]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[2]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

persuasive" and were supported by the mental status examination findings. (Tr. 30). Because the ALJ found the counselor and treating physician's opinion to be more supported by the mental status examination findings, the ALJ cannot be said to have found the two opinions equally persuasive. The ALJ did not err in addressing only the consistency and supportability factors of the medical opinion evidence and the RFC is supported by substantial evidence.

Ms. Cabrera concludes the RFC was not supported by substantial evidence because the evidence supports the state agency psychiatric consultants' opinions that she would have moderate limitation in her ability to carry out detailed instructions (Tr. 94) and her counselor and treating physician's opinion that she was seriously limited in completing a normal workday, sustaining an ordinary routine without special supervision, and performing at a consistent pace without an unreasonable number and length of breaks. (Tr. 641-42). Her argument is unavailing because even if substantial evidence or indeed a preponderance of the evidence supports her position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

For all of these reasons, I find the ALJ properly evaluated the totality of the evidence. Thus, reversal is not warranted on this basis.

## II.   The ALJ properly evaluated Ms. Cabrera's statements about the intensity, persistence, and limiting effects of her pain in accordance with SSR 16-3p.

Ms. Cabrera next claims the ALJ failed to consider Ms. Cabrera's pain in accordance with SSR 16-3p, from which she quotes extensively. (Pl.'s Br., ECF #14, PageID 870-72). After recounting her pain-related hearing testimony, Ms. Cabrera claims the ALJ failed to consider that her pain "would likely result in her inability to stand for four hours per day." (*Id.* at PageID 872). The Commissioner responds that in assessing Ms. Cabrera's statements regarding pain-related

limitations, the ALJ considered the entire record, including Ms. Cabrera's activities of daily living, the objective medical evidence, and her treatment history. (Comm'r's Br., ECF #15, PageID 891).

An ALJ follows a two-step process for evaluating an individual's symptoms. In step one, the Commissioner determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the Commissioner evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. *Id.*

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones,* 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of

26

the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

I find that the ALJ appropriately evaluated Ms. Cabrera's statements of disabling pain. She compared the statements with the objective medical evidence, daily activities, and Ms. Cabrera's lack of compliance with her provider's treatment recommendations to conclude that Ms. Cabrera's statements of disabling pain are inconsistent with the record.

Ms. Cabrera's argument to the contrary, supported only by hearing testimony the ALJ found inconsistent with the evidence, is not a compelling reason to disturb the ALJ's analysis.

## III.    Ms. Cabrera has not shown the need for a hand-held assistive device

Finally, Ms. Cabrera alleges the ALJ erred in finding Ms. Cabrera did not require a cane or walker. (Pl's Br., ECF #14, PageID 873). She points to Ms. Cabrera's prescription list, noting that a cane was prescribed on January 4, 2019. (*Id.* at PageID 874, citing Tr. 770).

According to SSR 96-9p, "to find that a hand-held device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9p.

Ms. Cabrera has shown the existence of a cane in her medical records but does not identify any medical documentation establishing the need for the device, nor the circumstances for which it is needed. In light of Ms. Cabrera's failure to meet her burden to prove disability, the ALJ's failure to include a cane in the RFC is not erroneous.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: December 21, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985)Dated: December 15, 2021.